THE PEOPLE *ex rel.* ILLINOIS SOCIETY OF ORTHODONTISTS *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* UNITED STATES DENTAL INSTITUTE, INC., Defendant-Appellee and Cross-Appellant.

First District (4th Division)    No. 76-299

Opinion filed February 16, 1978

Bernard E. Epton and Russell S. Barone, both of Chicago (Epton & Druth, Ltd., of counsel), for appellants.

Sudak, Grubman, Rosenthal & Feldman, of Chicago (Alan I. Boyer and Lawrence S. Bloom, of counsel), for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

■■ The sole question in this case is whether a school teaching courses in advanced dentistry to dentists is practicing dentistry contrary to statute (Ill. Rev. Stat. 1975, ch. 91, par. 42a), when the school through its instructors gives advice to the students on specific problems the students have, including diagnosis, pursuant to the contracts between the school and the students which provide that the students may bring in up to ten specific problems free of charge and any number thereafter at a charge of $50 a problem. We hold that the school is in violation of the statute.

The defendant, the United States Dental Institute (hereinafter Institute), teaches courses in orthodontics to licensed dentists. The Institute is approved by the Superintendent of Public Instruction; it is not, however, an accredited dental school approved by the Illinois Department of Registration and Education.

One of the instructors at the school is an orthodontist; the rest are

general dentists. All except one, Dr. Eilene Enriquez, a citizen of the Philippines, are licensed to practice in Illinois. All of the students are licensed dentists. It must be noted that while only orthodontists can hold themselves out to the public as orthodontists, any licensed dentist can practice orthodontic medicine. All a degree in orthodontics does is entitle a dentist, after complying with section 4a of the Dental Practice Act (Ill. Rev. Stat. 1975, ch. 91, par. 59a), to list himself as an orthodontist.

There are a few dental schools in Illinois giving courses in orthodontics leading to a degree in orthodontics. All of these schools give courses on a full-time basis only and forbid their students to practice dentistry while they are taking the courses. Besides instruction, these schools engage in clinical training where the student works on live patients under the supervision of an instructor. The Institute's program cannot, and does not, lead to a degree in orthodontics, and the Institute has never pretended that it does. What it does do is offer a part-time curriculum whereby the licensed dentist can gain additional knowledge in the field of orthodontics while continuing to practice dentistry. The advantages of this to the dentist are obvious.

While the evidence is meager and conflicting on the point, it appears that while the Institute does not require that its students work on live patients having orthodontic problems during the time they are taking the courses, the student dentists are encouraged to take patients since that is the best way to learn. They are, as we noted earlier, legally entitled to take such patients. The students determine whom they feel they are capable of treating, although the instructors, if they know of the case, will inform the student if they believe it to be beyond his capability. One of the important features of the school is its "back-up service." The student dentists can bring in records, including plastic models of the patient's dentition, X rays, intra and oral photographs and other documents, and the instructors will make a diagnosis and suggest a treatment plan which the students can choose to follow or reject; the student is encouraged to return during the course of the treatment with updated records which the instructor can use to continue to give advice. At no time does the instructor see these patients. Indeed, it is unlikely the patients ever know of the Institute's existence. It is unclear from the evidence whether only two of the instructors handle these problems or whether all of them do. Likewise, it is unclear whether all problems submitted are handled or whether the student brings in several from which the instructor selects some routine cases. Moreover, the record is silent as to whether these problems are handled as part of the classroom procedure or separately. It is clear that the Institute in its contract with the student agrees to furnish during the course of the 5-year program ten "hypothetical teaching guides" free of charge (*i.e.*, included in the $8,000 fee) and additional

"hypothetical teaching guides" for $50 per case. There is no restriction on the number of times the student may bring the same case back.

No student dentists were called to testify; consequently there was absolutely no evidence that the student dentists were encouraged or led to take cases they would not otherwise have taken. There was also no evidence that the student dentists, because of the back-up service, felt they were ceding responsibility for any case to the Institute. There was no evidence as to the ability (as opposed to the right) of the student dentists to handle the cases other than that many of them had been practicing as dentists for years. There was no evidence as to what proportion of the student dentists actually used the "back-up service," or how closely they followed the recommendation or how much they relied on the advice given rather than on their own skill and observations.

The plaintiff brought this action seeking to enjoin the performance of the back-up service on the theory in count I that it constituted the unlawful practice of dentistry and in count II that it constituted a nuisance. After hearing the evidence the trial court found:

"1. The defendant, as a school, serves a useful purpose. The Court should not interfere with its existence.

2. The Court does not possess the power to judge the qualifications of the faculty.

3. The Court does not possess the power to pass on the quality of the educational service rendered by the school.

4. The plaintiff has failed to establish a prima facie case that the defendant is engaged in the practice of dentistry, in violation of any of the provisions of the Dental Practice Act except as hereinafter set forth.

(a) The plaintiff has failed to establish a prima-facie case that the defendant represents itself as being able to treat or operate for any disease, pain, deformity, deficiency, injury, or physical condition of a human tooth, or teeth, alveolar process, gums or jaw.

(b) That the plaintiff has failed to establish a prima facie case that the defendant operates or conducts a place where dental operations are performed.

(c) That the plaintiff has failed to establish a prima facie case that the defendant performs dental operations of any kind, gratuitously or for a fee, gift, compensation or reward, pay, or to be paid, either to itself or to another person or agency.

5. The plaintiffs have established a prima facie case that the defendant, a non-professional service corporation owned and operated by non-dentists, does represent itself as being able to

diagnose existing orthodontic deficiencies of a specific patient and prescribe the remedy. It is the interpretation of this Court that the said functions are not limited to the relation between the dentist and a patient, but extends also to provide such functions to registered dentists as well. Such functions are beyond the course of instruction offered by the school as a means of continuing education for the licensed professional, in violation of the Act.

It is Therefore Ordered, Adjudged And Decreed, as follows:

A. That the defendant's motion for a finding in favor of the defendant, with respect to Counts I and II of plaintiff's Complaint be and hereby is sustained, except as to the prima facie case established by the plaintiff as hereinbefore set forth in Paragraph 5 hereof.

B. That the defendant corporation, United States Dental Institute, Inc., shall not represent itself to or practice diagnosis or prescribe remedies.

C. That defendant corporation, United States Dental Institute, Inc., be, and it hereby is, permanently and forever restrained and enjoined from, in any way, representing itself to any persons whatever, as being able to diagnose or in any way prescribe the treatment or remedy for the orthodontic deficiencies of or in any person or patient whatever."

## I.

The sole question to be considered by this court is whether the actions performed by the Institute constitute the practice of dentistry, since it is obvious from the facts in this case that these actions are performed by the corporation rather than by the dentists themselves, and, therefore, if constituting the practice of dentistry, must be banned.[1] Indeed, it does not appear that the defendant contends otherwise. The back-up service is provided pursuant to a contract between the Institute and the student-dentists, not between the teacher-dentists and the student-dentists. The payments for the additional services go to the Institute, not to the teacher-dentists directly. This is enough to demonstrate that it is the corporation, rather than the individual dentists, that is providing the service. (Compare *Basford v. Department of Registration and Education* (1945), 390 Ill. 601, 62 N.E.2d 482.) Also, we note that apparently these diagnoses are not given merely as a teaching aid by professors in class, but are given

---

[1] We note, however, that, while not argued by the plaintiff, even if we could consider the acts to be performed solely by the professor-dentists, should we find them to constitute the practice of dentistry as defined by statute, we would have to enjoin their performance by Dr. Enriquez since while she is a licensed dentist, she is not licensed to practice in Illinois.

instead, at least in part, by other "teachers" who do this full time. Thus, they cannot be compared to the advice given by professors in a class in response to specific questions.

■■ Illinois follows the majority rule that normally a corporation cannot practice dentistry (section 18a of the Dental Practice Act, Ill. Rev. Stat. 1975, ch. 91, par. 72a; *People v. United Medical Service, Inc.* (1936), 362 Ill. 442, 200 N.E. 157), unless it is a medical corporation which qualifies under the Professional Service Corporation Act (Ill. Rev. Stat. 1975, ch. 32, par. 415—1 *et seq.*), which, *inter alia,* requires that all stockholders of a professional corporation be licensed members of the specific profession. (Ill. Rev. Stat. 1975, ch. 32, par. 415—11.) The Institute cannot qualify under the latter statute since its stockholders are not all dentists; indeed, not even its officers are dentists. Section 18a of the Dental Practice Act provides that no corporation shall practice dentistry or engage therein, or hold itself out as being entitled to practice dentistry or to furnish dental services or dentists, or advertise or assume the title of dentist or furnish dental advice for any compensation or advertise that it can furnish dental service or dentists or solicit dental patronage for any dentist employed by a corporation, except that these prohibitions shall not apply to corporations furnishing information or clerical services:

(1) which can be furnished by persons not licensed to practice dentistry, and

(2) such information or services are furnished to any person lawfully engaged in the practice of dentistry, and

(3) the recipient dentist assumes full responsibility for such information and services.

It is undisputed that the student-dentists are permitted by law to perform orthodontic work even though they are not orthodontists. And it is clear, despite the plaintiff's contentions to the contrary, that the student-dentists remain fully responsible to their patients for any malpractice— indeed they cannot cede this responsibility, having assumed it, without their patient's consent. The only question for us to decide, then, is whether the actions performed by the corporation are ones which could have been performed by persons not licensed to practice dentistry. In other words, do the corporation's activities constitute the practice of dentistry as defined in section 5 of the Dental Practice Act. Ill. Rev. Stat. 1975, ch. 91, par. 60.

## II.

Despite the defendant's protestations, what the defendant does must be considered as diagnosis and the giving of dental advice. While "diagnose" is defined by the Random House Dictionary of the English Language (unabridged ed. 1966) as "to determine the identity of [a disease, illness,

etc.] by a medical examination," which the defendant does not do, since it does not examine the patient; "diagnose" is also defined by that dictionary "as to ascertain the cause or nature of (a disorder, malfunction) from the symptoms" which the defendant does do. Black's Law Dictionary also defines "diagnose" as "the discovery of the source of a patient's illness * * * from a study of the symptoms"; see also *Branham v. Gardner* (6th Cir. 1967), 383 F. 2d 614, 622 and other cases listed in Words and Phrases "Diagnose, Diagnosis." Thus it follows that applying the common understanding of the term, it is not necessary for the defendant to physically examine the patient to make a diagnosis, and since it is clear that the defendant, through its agents, does determine the nature of the malfunction and make recommendations as to what should be done, the defendant does in fact diagnose and give advice on dental problems.

### III.

Diagnosis is, of course, an important part of medical and dental treatment. The testimony of the plaintiff's witnesses as to the importance of diagnosis in orthodontic work, and, indeed, that some orthodontists do only diagnostic work, merely substantiates what we know from common experience. However, the fact that diagnosis is a part of medical practice does not necessarily mean that anyone making a diagnosis is practicing medicine or dentistry. Legal research is an important part of any lawyer's practice but that does not mean that anyone researching a legal problem is practicing law. Equally, we cannot say that every time a parent, relative or friend makes a diagnosis or gives medical advice he is illegally practicing medicine. Something more than that is required.

Nevertheless, it does seem clear that diagnosis, at least when practiced on a regular basis, generally has been considered a part of the practice of medicine or dentistry. As stated in *State ex rel. Kansas State Board of Medical Registration and Examination v. Martin* (1942), 155 Kan. 801, 804, 130 P.2d 601, 603-04:

> "We need not quote the section in full. Among the persons regarded as engaging in such practice is included any one 'who shall use the words or letters "Dr.," "Doctor," "M.D.," or any other title in connection with his name, which in any way represents him as engaged in the practice of medicine or surgery, or any person attempting to treat the sick or others afflicted with bodily or mental infirmities.'
> The 'practice of medicine', within the statutory definition above, is not limited to the prescribing of drugs. The diagnosis of a physical ailment and the prescribing for a fee of a treatment for its relief is the practice of medicine even though the prescribed treatment does not include the use of drugs."

Likewise in *People. v. Jordan* (1916), 172 Cal. 391, 399, 156 P. 451, 454, the court remarked:

> "Diagnosis is as much a part of the practice of medicine as is the administration of remedies, and it is a vastly more important branch thereof because, generally speaking, the treatment of disease is governed by the practitioner's theory regarding its cause. Intelligent treatment may only follow correct diagnosis. It is argued that diagnosis is merely 'guessing,' but that is only partially true. It is matter of common knowledge that in the present development of microscopy, chemistry, bacteriology, radiography and kindred sciences there are some diseases which may be detected with absolute certainty by the accomplished diagnostician. For example, it would be impossible for the educated medical man of to-day to be deceived into mistaking a case of diphtheria for some throat affection of a less virulent type for the reason that, with modern methods, the specific germ of diphtheria may be easily discovered and recognized. But even where it depends partly upon conjecture, real diagnosis is the product of knowledge and experience. To diagnose a case is as much a part of the practice of medicine as the drawing of pleadings or the giving of advice are parts of the practice of law. No one would say that an attorney who devoted his efforts to the preparation of cases, but did not personally present them in court, was not practicing law. The Supreme Court of the United States has declared diagnosis to be a part of the practice of the healing art, even in systems of treatment which do not deal with administration of remedies, but with mechanical adjustment of parts of the human body. In Collins v. Texas, 223 U. S. 288-296, 32 Sup. Ct. 286, 288 [56 L. Ed. 439], Mr. Justice Holmes, speaking for the court said:
>
> > 'The plaintiff in error professes, as we understand it, to help certain ailments by scientific manipulation affecting the nerve centers. It is intelligible therefore that the state should require of him a scientific training. Dent v. West Virginia, 129 U. S. 114 [9 Sup. Ct. 231, 32 L. Ed. 623]; Watson v. Maryland, 218 U. S. 173 [30 Sup. Ct. 644, 54 L. Ed. 987]. He like others must begin by a diagnosis. It is no answer to say that in many instances the diagnosis is easy—that a man knows it when he has a cold or a toothache. For a general practice science is needed.' "

Again, the court in *Noble v. State* (1932), 44 Ohio App. 10, 11-13, 184 N.E. 258, 259 in response to a contention that diagnosis could not

constitutionally be included under the statute since it is not part of "operative dentistry," remarked:

"A point is sought to be made and is stressed, based upon the theory that there is a distinction between so-called 'mechanical' and 'operative' dentistry. It is earnestly asserted that no license is required for doing mechanical dentistry, but only for practicing operative dentistry. Adopting our own definitions of these two terms, then, we are inclined to agree with this claim. If 'mechanical dentistry' be the making of plates or sets of teeth, or fillings or crowns, and so forth, from impressions taken by a licensed dentist, then we are inclined to agree that such labor need not be covered by state license. But we include in the term 'operative dentistry' all activities and examinations of the mouth of the patient leading to, and the making of, such impressions.

\* \* \*

Counsel for defendant seem to urge and claim that this work performed by the defendant should be classed as 'mechanical dentistry' and not 'operative dentistry.' With this claim we cannot agree. While it is true that section 1329, General Code, enumerates certain operations and treatments that constitute dentistry, for which a license is required, yet the diagnosis of the needs of the patient is a presumed condition precedent to any operation or treatment. The patient goes to a dentist to ascertain whether the teeth or jaws need treatment for disease or dental work, or whether or not there are any malpositions or malformations that require attention, and the successful determination of such needs rests and depends upon the learning, skill, and experience of the members of the dental profession, and presumably possessed by them exclusively.

Growing out of this claimed distinction, and grounded upon it, it is asserted that the statute is unconstitutional, and especially so if a license is required for one who performs only mechanical dentistry, including the diagnosis of the needs of the patients as performed by this defendant. We are of the unanimous opinion that this statute is constitutional, and that diagnosis is indispensably essential to and necessarily comprehended by and within the terms used to define operative dentistry or practicing dentistry in section 1329, General Code."

None of these cases, however, answer the questions whether the diagnosis of malpositions of the human teeth or jaws, and the recommendations of proper treatment to follow, not accompanied by any act upon the patient, constitutes the practice of dentistry within the

scope of section 5 of the Dental Practice Act. Section 5 at the time of trial read as follows:

"A person practices dentistry, within the meaning of this Act:

(1) Who uses a dental degree, or designation, or card, devise, directory, sign, or other media whereby he represents himself as being able to diagnose, treat, prescribe, or operate for any disease, pain, deformity, deficiency, injury, or physical condition of the human tooth, teeth, alveolar process, gums or jaw; or

(2) Who is a manager, proprietor, operator or conductor of a place where dental operations are performed; or

(3) Who performs dental operations of any kind gratuitously, or for a fee, gift, compensation or reward, paid or to be paid, either to himself or to another person or agency; or

(4) Who uses a roentgen or X-Ray machine for dental treatment, roentgenograms or for dental diagnostic purposes; or

(5) Who extracts a human tooth or teeth, or corrects or attempts to correct malpositions of the human teeth or jaws; or

(6) Who offers and undertakes, by any means or method, to diagnose, treat or remove stains or concretions (accretions) from human teeth or jaws; or

(7) Who uses or administers local or general anesthetics in the treatment of dental or oral diseases or in any preparation incident to a dental operation of any kind or character. This provision shall not apply to Dental Assistants administering anesthesia under the direction of a dentist licensed under this Act; or

(8) Who takes impressions of the human tooth, teeth, or jaws or performs any phase of any operation incident to the replacement of a part of a tooth, a tooth, teeth or associated tissues by means of a filling, crown, a bridge, a denture or other appliance; or

(9) Who furnishes, supplies, constructs, reproduces or repairs, or offers to furnish, supply, construct, reproduce or repair prosthetic dentures (sometimes known as 'plates'), bridges or other substitutes for natural teeth, to the user or prospective user thereof; or

(10) Who performs any clinical operation included in the curricula of recognized dental schools and colleges.

The fact that any person engages in or performs, or offers to engage in or perform, any of the practices, acts, or operations set forth in this Section, shall be prima facie evidence that such person is engaged in the practice of dentistry.

The following practices, acts, and operations, however, are exempt from the operation of this Act:

(a) The rendering of dental relief in emergency cases in the

practice of his profession by a physician or surgeon, licensed as such and registered under the laws of this State, unless he undertakes to reproduce or reproduces lost parts of the human teeth in the mouth or to restore or replace lost or missing teeth in the mouth; or

(b) The practice of dentistry in the discharge of their official duties by dentists in any branch of the Armed Services of the United States, the United States Public Health Service, or the United States Veterans Bureau; or

(c) Dental schools or colleges as now conducted and approved, or as may be approved, by the Department of Registration and Education, and the practice of dentistry by students in dental schools or colleges approved by the department, when acting under the direction and supervision of registered and licensed dentists acting as instructors; or

(d) The practice of dentistry by licensed dentists of other states or countries at meetings of the Illinois State Dental Society or component parts thereof, alumni meetings of dental colleges, or any other like dental organizations, while appearing as clinicians; or

(e) The use of roentgen or other rays for making roentgenograms or similar records of dental or oral tissues provided, that such service shall not be offered to the public by any name whatsoever, as an aid or inducement to secure dental patronage."

The plaintiff has argued that the defendant has violated paragraph (4) of the section, *i.e.*, has used a roentgen or X-Ray machine for dental diagnostic purposes. However, there was no evidence that the defendant itself ever used such a machine. Rather, it appears that the roentgenograms were taken by the student dentists who brought them to the school. In any event, paragraph (4) is not applicable since clause (e) allows the use of roentgenograms as long as the services are not offered to the public as an aid or inducement to secure dental patronage. In the case at bar, they were not offered by the Institute to the public, nor were they offered as an aid or inducement to secure dental patronage.

Accordingly the only paragraphs of section 5 which could possibly apply are paragraphs (1), (2), (3) and (5). Paragraphs (2) and (3) of the statute are unfortunately hopelessly ambiguous. Both refer to "dental operations." But the word "operations" may be construed to apply to surgery or may be construed to apply to any type of activity performed on a regular basis. If it means the former, then the limitation of paragraph (2) to places where dental surgery is performed seems unreasonable; if the latter, then at first sight, paragraph (3) would appear to render the rest

of the statute superfluous. If that paragraph refers to any and all kinds of dental activity, then what need is there to single out particular kinds of dental activity in the subsequent paragraphs? And, on the other hand, if we consider the statute to mean that "a person practices dentistry * * * who performs dental operations of any kind" we are still left with the question what are "dental operations?" To define dentistry in the terms of dental operations is pure tautology.

It seems more logical, despite the enumeration in the statute of the paragraphs as alternatives, not to treat paragraphs (2) and (3) as alternative ways of practicing dentistry at all. Rather, it appears that the legislature's purpose in enacting paragraph (2) was to extend the scope of the statute to apply to any manager, etc. of a place where activities described in paragraphs (4)—(10) are performed. Likewise, it appears that the purpose of paragraph (3) was to make it clear that the repeated practice of the activities described in paragraphs (4)—(10) is considered to be the practice of dentistry whether they are done for a fee or gratuitously, particularly since the tendency of the courts, absent any such specific provision, has been to construe such statutes as limited to practice for reward or compensation. (70 C.J.S. *Physicians and Surgeons* §10(n) (1951).) Following this reasoning, we conclude that the phrase "dental operations" in these two paragraphs does not expand the definition of the practice of dentistry as found in paragraph (4)—(10). Accordingly, we must look to paragraph (5) to determine whether the activities involved here, other than the advertising, fall within the scope of the statute.

■■ It is noteworthy that paragraph (5) does not refer to one who diagnoses, but only to one who "corrects or attempts to correct malpositions of the human teeth or jaws." Although both paragraphs (4) and (6) do refer to diagnosis, in view of its omission from the one paragraph despite its inclusion in two others, we might be forced to conclude, if we were to strictly construe the statute, that under the Illinois statute the diagnosis of malpositions of the human teeth or jaws does not constitute the practice of dentistry and, therefore, to conclude that the defendant's activities here do not constitute the practice of dentistry since the defendant does not correct or attempt to correct malpositions of the teeth of jaws; rather, it (through its teacher-dentists) merely diagnoses and gives advice to a dentist (who is *not* its employee or under its control as in *Noble*), who then corrects or attempts to correct the malpositions. However, as provided by section 1a of the Dental Practice Act (Ill. Rev. Stat. 1975, ch. 91, par. 56a):

> "The practice of dentistry in the State of Illinois is hereby declared to affect the public health, safety and welfare and to be subject to regulation and control in the public interest. It is further

declared to be a matter of public interest and concern that the dental profession merit and receive the confidence of the public and that only qualified persons be permitted to practice dentistry in the State of Illinois. This Act shall be liberally construed to carry out these objects and purposes."

It must be borne in mind that the cardinal rule of statutory construction, to which all other rules are subordinate, is that a statute must be construed so as to ascertain and give effect to the intention of the legislature (34 Ill. L. & Prac. *Statutes* §113 (1958)), and the spirit or intention of the law prevails over the letter thereof. (34 Ill. L. & Prac. *Statutes* §115 (1958).) Accordingly, the court may read words into a statute when necessary to realize the legislative intentions. (34 Ill. L. & Prac. *Statutes,* §122 (1958).) Since we must follow the legislative intent to protect the public health, safety and welfare as set forth in section 1a, we cannot hold that merely because the legislature omitted the word "diagnose" from section 5(5), the diagnosis of malformation of the teeth or jaws cannot be considered the practice of dentistry. To the contrary, following the legislative intent, we must hold that if a person sets himself up to diagnose and give advice to the public as to malformations of the teeth and jaws, as it appears from the testimony many orthodontists do, that person would be engaged in the practice of dentistry under the statute, even if he did not go further and attempt to correct the malformations himself.

## IV.

The defendant, however, contends that it is not guilty of the practice of dentistry since there was no dentist-patient relationship between it and the parties treated and that it only gave advice to other dentists. There is some case support for this position.

It was pointed out in *Kraus v. City of Cleveland* (Com. Pl. 1953), 66 Ohio L. Abs. 417, 55 Ohio Op. 6, 116 N.E.2d 779, *affirmed* (1954), 76 Ohio L. Abs. 214, 55 Ohio Op. 36, 121 N.E.2d 311, *affirmed* (1953), 163 Ohio St. 559, 127 N.E.2d 609, *cert. denied* (1956), 351 U.S. 935, 100 L. Ed. 1463, 76 S. Ct. 833, that the practice of medicine presupposes the existence of a personal relationship of physician and patient between two persons. Likewise, the Illinois Supreme Court in *People v. Carr* (1916), 276 Ill. 329, 114 N.E. 494, refused to find a violation of the statute where there was no doctor-patient relationship. In that case, the defendant, a dentist licensed to practice dentistry in Utah but not in Illinois was engaged in attempting to demonstrate and sell certain dental instruments he had developed. He taught a course in the use of these instruments to licensed dentists. Each of the students was required to pay $175 tuition and $175 for a set of the instruments. After the student was taught how to keep each of the

instruments in proper condition, he would bring in one of his patients. The defendant then, in the presence of the student, would strip, scrape, plane, polish and grind the patient's teeth, demonstrating to the student the use of the instruments. The greater part of the work, however, was done on the teeth of the different patients by the student-dentists themselves. The Illinois Supreme Court, in reversing the appellate court which had found a violation of the statute, stated at 276 Ill. 329, 331-32, 114 N.E. 495:

> "It is very evident from the foregoing statement that the plaintiff in error did not practice dentistry as such occupation is ordinarily understood and followed. It is true that he did sometimes work on the teeth of patients who were brought to the school by other dentists, but in each instance the patient was being treated by a licensed dentist in regular practice and practically all the work was done by such dentist. Had plaintiff in error habitually done any of the things mentioned in the act for compensation, or without compensation, he would have been guilty. *One test would be whether the persons treated could be considered as patients of plaintiff in error. He would not be practicing dentistry unless the relation of practitioner or doctor and patient existed between him and those for whom he did work. No such relationship existed. The patients in every case were under the care and treatment of regularly licensed dentists, who did practically all the work that the evidence shows was done.* Plaintiff in error was teaching these dentists a method of treatment. What little work he actually did, as shown by the evidence, was merely illustrative of his real business,—that of selling instruments and teaching the use of the instruments he sold. *It would be different if plaintiff in error had been engaged in selling his instruments and teaching their use to persons having no previous knowledge of dentistry or who were not qualified to practice that profession.*" (Emphasis added.)

However, we are governed by the statutes which exist today, not those which existed when *Carr* was decided. The various sections of the act should be construed together (34 Ill. L. & Prac. *Statutes* §131 (1958)), and they should be construed so as to give the statute effect and not to nullify it. As we noted before, section 18a of the Dental Practice Act permits a corporation to furnish information, if three conditions are met: (1) the information can be furnished by persons not licensed to practice dentistry; (2) the information is furnished to a person lawfully engaged in the practice of dentistry; (3) the recipient dentist assumes full responsibility for such information and services.

■■ While the second and third conditions have been met, since we

have determined that the diagnosis and giving of dental advice is part of the practice of dentistry, it is not information which a person not licensed to practice dentistry can furnish. Were we to adopt the construction argued for by the defendant, we must read the first condition out of the statute since in no case would the exemption purport to apply unless the information is given to a licensed dentist and not to the public. Accordingly, while we agree with the defendant that there has been no showing that the public has been injured by the defendant's conduct,[2] the defendant's conduct is in violation of the statutes and must be enjoined. The granting of an injunction where a party unlawfully practices medicine or dentistry is not dependent on a finding of public injury. *Lewis v. Kentucky State Board of Dental Examiners* (Ky. 1957), 300 S.W.2d 241.

## V.

■■ Since we have held, reversing the trial court, that the providing of the "back-up" service by the Institute constitutes the unlawful practice of dentistry by a corporation and must be enjoined, it naturally follows that the advertising of such service also must be enjoined.

Accordingly, the trial court's determination that the Institute should be enjoined from representing itself to any persons as being able to diagnose or prescribe treatment for orthodontic deficiencies is affirmed. However, the trial court order denying the issuance of an injunction restraining the Institute from offering the "back-up" service to the dental students is reversed and the case remanded to the trial court for the entry of an order in conformity with the opinion. Nothing in the opinion shall be

---

[2] The plaintiff has argued that the evidence clearly showed a dangerous practice, *i.e.*, the diagnosis of malposition without examining the patient. Apparently the plaintiff considers this dangerous even if performed by a licensed dentist (and not by a corporation as in this case). But it is not for the court to determine what a licensed dentist may or may not do in handling a case. We do not sit as supreme overseers to dictate how a professional is to conduct his practice. We do not have the expertise. If the plaintiff sincerely believes the practice should be enjoined, it should go to the Department of Public Health and seek a ruling. Since no rule forbidding this practice has been cited, we must conclude there is none. Accordingly, we cannot conclude that a practice perfectly lawful when performed by a licensed dentist is contrary to public policy.

The plaintiff has also argued that the defendant has encouraged incompetent practitioners to handle cases they are unqualified to handle. As it argued on oral argument, the plaintiff assumes that since the students choose to enroll in a course of instruction they must have been unqualified. The plaintiff also assumes the dentists, absent the "back-up" service, would not have undertaken orthodontic work. But while the parties are entitled to make assumptions not supported by the evidence, this court is not. Bearing in mind the fact that at all times the student dentists were legally entitled to perform orthondontic work we can neither assume they would not have exercised the right absent the defendant's solicitation nor assume they are unqualified and therefore dangerous to the public, absent any evidence in the record to support the assumptions. The burden of proof was on the plaintiff and it failed to produce any evidence on this point.

1044

considered to forbid the individual dentists, if licensed to practice in Illinois, from making diagnosis or giving dental advice for compensation or not, as long as this is done by them and not by the corporation.

Judgment affirmed in part, reversed in part and remanded to the trial court with instructions.

Affirmed in part; reversed in part and remanded.

JOHNSON, P. J., and LINN, J., concur.